**Willis PARKER, Petitioner,**

v.

**Robert F. PARRATT, Warden, Nebraska Penal and Correctional Complex, Respondent.**

**Armstead PIERCE, Petitioner,**

v.

**Robert F. PARRATT, Warden, Nebraska Penal and Correctional Complex, Respondent.**

Civ. Nos. 78–L–30, 78–L–31.

United States District Court, D. Nebraska.

Jan. 6, 1981.

---

\* \* \* \* \* \*

Jarve L. Garrett, Omaha, Neb., for petitioner.

Harold Mosher, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for respondent.

DENNEY, District Judge.

## NATURE OF THE CASE

The petitioners, Willis Parker and Armstead Pierce, seek writs of habeas corpus under 28 U.S.C. § 2254. They allege that their Sixth Amendment rights were infringed when they were jointly tried and convicted in state court, where they were represented by the same court-appointed attorney. The gist of petitioners' claim for relief is that they were denied effective assistance of counsel because of a conflict of interest on the part of their attorney.

## FACTS AND BACKGROUND

Petitioners Parker and Pierce were arrested as suspects in connection with an eighteen year old woman's complaint that she had been kidnapped and raped. Parker and Pierce later were separately charged with kidnapping and rape in the District Court of Douglas County, Nebraska. A state court judge ordered that their trials be consolidated. Assistant Douglas County Public Defender William Campbell was assigned to represent both men. At the consolidated trials, the jury returned guilty verdicts on both counts. Parker and Pierce appealed to the Nebraska Supreme Court. They contended that the evidence at trial was insufficient to convict them. They also argued that, because Public Defender Campbell represented both of them under a conflict of interest, their Sixth Amendment rights to effective assistance of counsel were infringed.[1] The Supreme Court of Nebraska rejected these arguments and affirmed the convictions. *State v. Parker, State v. Pierce*, 196 Neb. 762, 766, 246 N.W.2d 210, 212 (1976).

1. On appeal to the Nebraska Supreme Court, Parker and Pierce were both represented by Bruce G. Mason, a privately retained attorney from Omaha, Nebraska. In these federal habeas corpus proceedings, the petitioners are represented by Jarve L. Garrett, another Omaha attorney engaged in private practice. It should be pointed out that Mr. Garrett has fully and

Before proceeding any further, it might be useful to set out the general factual background of these cases, as found by the Nebraska Supreme Court:

The prosecuting witness was 18 years of age. She testified that she and her nephew, who was 2 years old, had gone to a grocery store in Omaha, Nebraska. When they arrived at the grocery store it was closed. As they were leaving the parking lot an automobile driven by the defendant Pierce drove into the parking lot and pulled up next to her. While Pierce tried to engage her in conversation, the defendant Parker got out of the car, picked up her nephew, and placed him in the back seat of the automobile. Parker then told her she had to go with them because they had her nephew in the car.

The prosecuting witness entered the front seat of the car and Parker got in the back seat with the nephew. After driving around for a while, Pierce stopped at a liquor store and obtained some wine. He then drove to a house near 28th and Miami Streets, rented by a brother of Pierce, and all four of them went into the house.

The defendants drank some of the wine and smoked some marijuana cigarettes. Pierce asked the prosecuting witness to dance with him so she danced with him for a while. When she tried to leave the house one of the defendants grabbed her and threw her in a chair and threw the nephew on a couch. She fought with the defendants and scratched them, and bit Parker when he tried to kiss her. Finally Pierce took her into the bedroom, pushed her onto the bed, and told her to take her clothes off. When she refused, Parker came into the bedroom and said he would throw her nephew down the stairs if she

properly advised the petitioners of the potential conflict of interest created by his dual representation, whereas Public Defender Campbell did not give similar advice (Transcript of Federal Court Habeas Corpus Proceedings, August 31, 1978, 22:9 to 23:18, 36:3–14, 46:14 to 47:2, and 49:18 to 50:3).

didn't do what they wanted. Pierce had sexual intercourse with her first and then Parker had sexual intercourse with her. When they had finished the defendants took her to 40th and Pratt Streets.

The prosecuting witness called one of her teachers from a friend's house near 40th and Pratt Streets and asked her to come and get her. When the teacher and her husband arrived the prosecuting witness told them she had been raped, related the details of the offense, and pointed out the house where it had occurred. When she arrived home she told her mother she had been raped and related the details of the offense. The police were called and came to her home where they interviewed her. She was examined at the University of Nebraska Medical Center and sperm was found in her vagina.

*State v. Parker, State v. Pierce, supra,* 196 Neb. at 763–64, 246 N.W.2d at 211.

The petitioners are presently serving concurrent twenty-five year sentences pursuant to their kidnapping and rape convictions. In February, 1978, they filed petitions seeking federal habeas corpus relief. This Court has held two hearings on these cases. The first hearing was held in August of 1978, and the second was held in February of 1980.

A consolidated supplemental memorandum brief was submitted on behalf of the petitioners on August 1, 1980. In support of the prayer for habeas corpus relief, the petitioners made two arguments, summarized as follows:

I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO APPOINT SEPARATE COUNSEL OR ALTERNATIVELY ERRED BY FAILING TO TAKE ADEQUATE STEPS TO ASCERTAIN WHETHER THE RISK OF A CONFLICT OF INTEREST WAS TOO REMOTE TO WARRANT SEPARATE COUNSEL. AND THE TRIAL COURT DID NOT CONDUCT A MEANINGFUL INQUIRY AND THERE WAS NO KNOWING AND VOLUNTARY WAIVER FOR PETITIONERS OF THEIR RIGHT TO SEPARATE COUNSEL. THE TRIAL COURT COMMITTED PREJUDICIAL ERR [sic] BY ORDERING PETITIONERS [sic] TRIAL CONSOLIDATED.

II. THE RIGHTS OF THE PETITIONERS WERE PREJUDICED BY THE INCOMPETENCY OF COURT APPOINTED COUNSEL IN FAILING TO OBJECT TO THE CONSOLIDATION FO [sic] THE TRIALS. THE RIGHTS OF THE PETITIONERS WERE PREJUDICED BY THE INCOMPETENCY OF THE COURT APPOINTED COUNSEL IN FAILING TO MAKE A REQUEST FOR SEPARATE COUNSEL FOR THE CODEFENDANTS OR ALTERNATIVELY THE RIGHTS OF THE PETITIONERS WERE PREJUDICED BY COURT APPOINTED COUNSEL'S FAILURE TO TAKE ADEQUATE STEPS TO WARN THEM ABOUT THE POTENTIAL CONFLICTS OF INTEREST IN THEIR RESPECTIVE CASES. COURT APPOINTED COUNSEL DID NOT CONDUCT A MEANINGFUL INQUIRY TO DETERMINE WHETHER PETITIONERS WISHED TO WAIVE THEIR RIGHT TO SEPARATE COUNSEL.

Petitioners' Consolidated Supplemental Brief at i.

## CUYLER v. SULLIVAN

The Court has noted various dates of filings, hearings, and briefs. These dates are important only because the United States Supreme Court quite recently decided a case which is dispositive of most of the issues present herein. On May 12, 1980, the Supreme Court handed down its decision in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) [hereinafter cited as *Sullivan* ].

*Sullivan* reached the Supreme Court in the following manner:

Two privately retained lawyers represented respondent and two others charged with the same murders. Respondent, who was tried first, made no objection to the multiple representation. The defense rested at the close of the prosecutor's case, and respondent was convicted. The two codefendants later were acquitted at separate trials. Respondent then sought collateral relief under Pennsylvania law, alleging that he had not received effective assistance of counsel because his lawyers represented conflicting interests. After a hearing at which both defense lawyers testified, the Pennsylvania Court of Common Pleas denied relief. The Pennsylvania Supreme Court affirmed, finding no multiple representation and concluding that the decision to rest the defense was a reasonable trial tactic. Respondent next sought habeas corpus relief in Federal District Court, but the court accepted the Pennsylvania Supreme Court's conclusion that respondent's lawyer did not represent the other defendants and further concluded that respondent had adduced no evidence of a conflict of interest. The Court of Appeals for the Third Circuit reversed. It held that the participation of the two lawyers in all three trials established as a matter of law that both lawyers represented all three defendants, and that the possibility of conflict among the interests represented by these lawyers established a violation of respondent's Sixth Amendment right to counsel.

*Sullivan, supra*, Syllabus by the Reporter of Decisions, 100 S.Ct. at 1711.

 Insofar as it is pertinent to the habeas corpus relief sought by Parker and Pierce, the *Sullivan* decision is important mainly for three propositions of law. First, under 28 U.S.C. § 2254(d), a state court determination of whether an attorney undertook improper dual representation of criminal defendants is not binding on a federal court, i. e., such a determination is a mixed one of law and fact that requires the application of legal principles to the historical facts of the case. *Sullivan, supra*, 100 S.Ct. at 1714–15. Secondly, while *Holloway*

*v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), mandates timely investigation by state courts of objections to multiple representation, the Sixth Amendment does not require state courts to initiate inquiries into the propriety of multiple representation in every case. *Sullivan, supra*, 100 S.Ct. at 1717. Absent special circumstances, state trial court judges may assume either that multiple representation entails no conflict, or that the lawyer and his or her clients knowingly accept such risk of conflict as may exist. *Id.* The rationale for this rule is that trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. *Id.* Lastly, the Supreme Court rejected the Third Circuit's conclusion that the mere possibility of conflict of interest on the part of defense counsel is enough to impugn a criminal conviction. To the contrary, "[i]n order to establish a violation of the Sixth Amendment, a defendant who fails to make an objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* 100 S.Ct. at 1718. However, it is important to note that a defendant who satisfies the two tier test of "actual conflict" and "adverse effect" need *not* go further and demonstrate any particular degree of prejudice in order to obtain relief. *Id.* 100 S.Ct. at 1719.

As applied to the cases at bar, the *Sullivan* decision is extremely helpful because it answers many previously unanswered constitutional questions. On the other hand, because this Court conducted its two hearings prior to the date of the Supreme Court's decision, the evidence adduced is, like the concomitant written argumentation, slightly off the mark. Despite this discrepancy, sufficient evidence and briefs have been developed to decide whether the petitioners' constitutional rights were infringed.

## CONDUCT OF THE STATE TRIAL COURT

 Petitioners contend that the state trial court erred by failing to appoint separate defense counsel. Squarely addressing this contention, the Supreme Court states:

*Holloway* requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in *Holloway, supra*, at 485–[486], 98 S.Ct., at 1179, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" 435 U.S., at 485, 98 S.Ct., at 1179, quoting *State v. Davis*, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

*Sullivan, supra*, 100 S.Ct. at 1717 (footnotes omitted). In discussing the proper role of the trial judge, a majority of the Supreme Court concedes that it is preferable to make diligent inquiry into possible conflicts of interest on the part of defense counsel. *See id.* at n.10. But, while such inquiry is preferable and should be encouraged, it is now clear that it is not constitutionally imperative.

A thorough review of the state court record, as well as the live testimony presented during the hearings before the Court, indicates that no "special circumstances" existed that should have alerted the state court to a conflict of interest problem.

The Honorable Theodore L. Richling, District Judge of the Fourth Judicial District, Omaha, Nebraska, testified before this Court to explain why the petitioners were not tried separately.[2] The following testimony of Judge Richling is pertinent:

Q. Okay. And do you have present recollection as to the reason, what the reason was that you ordered consolidation?

A. Well, I was satisfied after a full discussion that there was going to be no conflicting defense. The defense as represented to me was that the victim had consented so there was no abduction. It was one of consent. And I was satisfied from all that was presented that there wouldn't be any conflict, and in the police record, as I recall now, the only conflict that I found that was on the police record was that when they were originally questioned, one of them was married and one of them was single so one tried to—the single one tried to cover up for the married one, but that was resolved later on by both adopting the defense of consent.

(Transcript of Federal Court Habeas Corpus Proceedings, February 29, 1980, 14:9–25).

■ As will be discussed in more detail below, the police records that Judge Richling refers to *did* involve conflicts aside from the initial false statement that Pierce gave to the police. But, these additional conflicts are not so readily apparent in the police records that this Court can say that Judge Richling knew or reasonably should have known of their existence. *Sullivan, supra*, 100 S.Ct. at 1717. Therefore, the petitioners are not entitled to habeas corpus relief on the basis of the trial court's conduct.

## CONDUCT OF DEFENSE COUNSEL

Pointing also to alleged conflicts of interest on the part of defense counsel, the peti-

---

**2.** While the late Judge Rudolph Tesar actually presided at the petitioners' trial, Judge Richling conducted the pretrial hearing at which the cases were consolidated.

tioners contend that they are entitled to habeas corpus relief. Their argument is couched in terms of the public defender's incompetency, i. e., they claim that he was incompetent because he failed to seek separate trials for them despite their conflicting interests.

■ In view of *Sullivan,* it appears that this case should not really focus on the competency of the petitioners' appointed defense attorney. This is because if the petitioners can establish that an actual conflict of interest adversely affected defense counsel's performance, under *Sullivan* the competency of their attorney in failing to remedy the conflict becomes moot, i. e., if they can satisfy the seemingly lenient test for Sixth Amendment relief in *Sullivan,* it is immaterial whether they could go further and establish that defense counsel was incompetent and that said incompetency resulted in "material prejudice." *United States v. Hach,* 615 F.2d 1203, 1205 (8th Cir. 1980), *cert. denied,* 446 U.S. 912, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980). Conversely, though, if either petitioner is unable to show actual conflict *and* adverse effect, then certainly he will also be unable to establish the requisite degree of prejudice, even if incompetency is presumed. Therefore, the proper analysis of these cases should be confined to the principles elucidated in *Sullivan,* and should not extend to the principles developed in cases involving defense attorneys who failed strategically and tactically to protect the rights of their clients.

The Nebraska Supreme Court discussed the conflict of interest problem in these cases as follows:

The other assignment of error relates to the fact that the defendants were represented by the same attorney at the trial. The defendants contend they were denied effective assistance of counsel because their defense involved conflicting interests.

There was no objection made in the trial court to the consolidation of the cases for trial or to the representation of both defendants by one lawyer.

The claim of a conflict in interest is based, primarily, upon a pretrial statement by Pierce to the police in which Pierce stated that no one was with him when he was with the prosecuting witness. Pierce admitted on direct examination that the statement was untrue and said that he had made the statement in an effort to protect Parker, his cousin, who was married.

The statement was not prejudicial to Parker because he admitted that he had sexual intercourse with the prosecuting witness. The issue was consent, not whether Parker had participated in the offense. There was no conflict of interest which prevented Parker from having a fair trial.

*State v. Parker, State v. Pierce, supra,* 196 Neb. at 766, 246 N.W.2d at 212. The Nebraska Supreme Court was correct when it said that the claim of conflict of interest raised on appeal involved "primarily" Pierce's inconsistent pretrial statement to the police. The Nebraska court was also correct when it said that Pierce's pretrial statement was not germane to the defense of consent that the two defendants asserted at trial.

But, the state court did not recognize that the conflict of interest claims were at least in part based on other inconsistencies that *were* indeed germane to the credibility of the consent defense. Not addressed by the Nebraska Supreme Court was the following argument regarding the conflict of interest:

[C]ounsel by representing both defendants was prevented from pursuing a vigorous examination of either defendant regarding alleged admissions either one made outside the presence of the other to Miss Johnson. Counsel was caught between Charybdis and Scylla. If he examined Mr. Pierce vigorously he potentially damaged Mr. Parker. If he examined Mr. Parker thoroughly he potentially damaged Mr. Pierce, also his client. Or if he attempted to actively protect Mr. Parker he damaged Mr. Pierce.

The following testimony of Mr. Parker highlights the dilemma:

*Cross-Examination by Mr. Warin (327:3–24):*

Q. Do you remember telling Officer O'Donnell that Herbert (Pierce) then grabbed her and she might have thought he was forcing her into the bedroom, do you remember telling Officer O'Donnell that?

A. No, I don't.

Q. Is it you don't remember telling him that, or you didn't tell him that?

A. I don't remember.

Q. You could have told him that?

A. Possible, yes.

Q. Herbert grabbed her, she might have thought he was forcing her into the bedroom.

A. Probably.

Q. *Do you remember telling Officer O'Donnell that you thought she wanted to have sex with Herbert, but not with you ?*

A. *Yes.*

Q. You told Officer O'Donnell that?

A. Yes.

Q. But yet she did have intercourse with you, didn't she, Mr. Parker?

A. Yes, she did.

Consolidated Briefs of Appellants at 30–31, *State v. Parker, State v. Pierce, supra,* 196 Neb. 762, 246 N.W.2d 210 (1976) (emphasis added).

The testimony set out immediately above plainly indicates that Parker and Pierce did not have equally credible claims to the consent defense. As counsel for the petitioners states:

In a trial making an individual client look better than his co-defendant is critically important. In a trial material facts on which a jury may rely as to differend [sic] defendants can be both subtle and include a consideration of different degrees of culpability, statements from witnesses, statements from the co-defendants themselves, sincerity, and emphasis upon key testimony.

The defendant who has the best case factually in the charged defense has a strong interest in disassociating himself from his co-defendant and having his lawyer to communicate his factual strengths to the jury. No such a strategy is possible when all defendants are represented by the same lawyer.

. . . . .

Defendant comparisons, however, are not always ... direct and they elude the attention of a reviewing court in two separate ways. First, counsel's arguement [sic] emphasizing the lack of evidence against the one defendant may carry an inference that the government evidence is stronger against the co-defendant. Second, if counsel declines or argues the weakness of the government evidence against one client to protect the second, the first defendant has been denied adequeate [sic] representation.

Consolidated Supplemental Brief of Petitioners at 29–31.

The conflicting interests of Parker and Pierce at their trial are indicated sufficiently by Parker's testimony as set out above. While the conflict is not glaring, this Court concludes as a result of a mixed determination of fact and law that an "actual conflict" existed. *Sullivan, supra,* 100 S.Ct. at 1715.

Aside from the conflict already discussed, the Public Defender ought to have disqualified himself from dual representation for even a more compelling consideration. Even though Parker and Pierce jointly asserted the defense of consent, the record indicates that the prosecutrix struggled to a certain extent with both men. (State Court Bill of Exceptions, Volume I, 19:4 to 20:23). When a defense such as this one is raised, it is not unusual for the prosecutor or defense counsel to address whether the defendant(s) incurred any injuries or markings indicating that the prosecutrix resisted sexual intercourse. The defect in these cases is that the Public Defender consented to a joint trial and presented a joint defense of consent, even though only one of his clients exhibited any injury that could be construed by a jury as evidence that the prosecutrix resisted and withheld consent.

Since the Public Defender did not testify before this Court, there is no way to determine whether he was actually aware of this conflict. Still, he certainly should have been aware of the problem. In this regard, the petitioners have offered into evidence the case files of Public Defender Campbell which he compiled while representing Parker and Pierce [Exs. # 6 and # 7, respectively].[3] Contained in those files are police reports which contain details of the police investigation, including statements made by Parker and Pierce. In one such report, Parker is quoted as having said that, while he was kissing the prosecutrix, she scratched him on the neck. The police report on Parker also states that during a line-up the prosecutrix said that she recognized the scratches that she made on Parker's neck. Finally, even though not offered at trial, the police report also indicates that close-up photographs of the scratches were taken at the stationhouse. It is important to note that the reports compiled by the police on Pierce make no mention of any scratches inflicted upon that suspect.

The foregoing discussion establishes that there were two major actual conflicts in the jointly asserted consent defense of Parker and Pierce. The first conflict is seen in Parker's testimony that at one time he thought the prosecutrix wanted to have sex with Pierce, but not with him. The second conflict arises from the police reports which clearly indicate that only Parker incurred injuries from the prosecutrix. Actual conflict having been found, it is now appropriate for the Court to go on to deal with the second half of the *Sullivan* two-part test, to wit, adverse effect on defense counsel's performance as a result of the actual conflict.

Writing for a 7–2 majority[4] in *Sullivan*, Justice Powell's comments on adverse effect are brief. He states:

*Glasser* established that unconstitutional multiple representation is never harmless error. Once the Court concluded that

Glasser's lawyer had an actual conflict of interest, it refused "to indulge in nice calculations as to the amount of prejudice" attributable to the conflict. The conflict itself demonstrated a denial of "[t]he right to have the effective assistance of counsel." 315 U.S., at 76, 62 S.Ct., at 467. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. See *Holloway, supra*, 435 U.S., at 487–491, 98 S.Ct., at 1180–1182. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. See *Glasser, supra*, 315 U.S., at 72–75, 62 S.Ct., at 465–467.

*Sullivan, supra*, 100 S.Ct. at 1719 (footnote omitted).

The foregoing language in *Sullivan* is problematic. In other words, where is the line to be drawn between actual adverse effect and a presumedly higher amount of material prejudice? Justice Marshall discusses this semantical difficulty, stating:

I dissent from the Court's formulation of the proper standard for determining whether multiple representation has violated the defendant's right to the effective assistance of counsel. The Court holds that in the absence of an objection at trial, the defendant must show "that an actual conflict of interest adversely affected his lawyer's performance." *Ante*, at 1718. If the Court's holding would require a defendant to demonstrate that his attorney's trial performance differed from what it would have been if the defendant had been the attorney's only client, I believe it is inconsistent with our previous cases. Such a test is not only unduly harsh, but incurably speculative as well. The appropriate question under the Sixth Amendment is whether an actual, relevant conflict of

---

**3.** The respondent has objected to the admission of these exhibits into evidence. The objection is overruled.

**4.** Justices Brennan and Marshall dissented, filing separate opinions.

interests existed during the proceedings. If it did, the conviction must be reversed. *Sullivan, supra,* 100 S.Ct. at 1721 (Marshall, J., dissenting). Justice Marshall goes on to say:

> Because it is the simultaneous representation of conflicting interests against which the Sixth Amendment protects a defendant, he need go no further than to show the existence of an actual conflict. An actual conflict of interests negates the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney.
>
> Moreover, a showing that an actual conflict adversely affected counsel's performance is not only unnecessary, it is often an impossible task. As the Court emphasized in *Holloway*:
>
> "[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing . . . . It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." 435 U.S., at 490–491, 98 S.Ct., at 1182 (emphasis in original).
>
> Accordingly, in *Holloway* we emphatically rejected the suggestion that a defendant must show prejudice in order to be entitled to relief. For the same reasons, it would usually be futile to attempt to determine how counsel's conduct would have been different if he had not been under conflicting duties.
>
> . . . in many cases the effects of the conflict on the attorney's performance will not be discernible from the record. It is plain to me, therefore, that in some instances the defendant will be able to show there was an actual, relevant conflict, but be unable to show that it changed his attorney's conduct.
>
> It is possible that the standard articulated by the Court may not require a defendant to demonstrate that his attorney chose an action adverse to his interests because of a conflicting duty to another client. Arguably, if the attorney had to make decisions concerning his representation of the defendant under the constraint of inconsistent duties imposed by an actual conflict of interests, the adequacy of the representation was adversely affected. See *ante,* at 1719 (defendant must show "that his counsel actively represented conflicting interests"). If that is the case, the Court's view and mine may not be so far apart after all.

*Id.* at 1722–23 (footnotes omitted).

Due to the fact that *Sullivan* was decided so recently, there naturally is very little case law available to help resolve the semantical problems raised by Justice Marshall. However, one federal district court has stated:

> This language strikes a compromise between the often impossible task of showing actual prejudice from a conflict, and the rather lenient requirement that only a bare conflict need be shown. A constitutional defect will exist only when it can be demonstrated that a conflict actually affected counsel's behavior in a way detrimental to his client.

*Baty v. Balkcom,* 494 F.Supp. 960, 967 (S.D. Ga.1980).

■ This Court believes that most of Mr. Justice Marshall's criticisms of the "adverse effect" portion of the majority opinion in *Sullivan* are well taken. The Court disagrees, though, with Justice Marshall's suggestion that the standard articulated by the majority opinion may not require a defendant to demonstrate that his attorney chose an action adverse to his interests because of a conflicting duty to another client. *Sullivan, supra,* 100 S.Ct. at 1723 (Marshall, J., dissenting). Justice Marshall's analysis points to certain language in the majority opinion, to wit: "But until a defendant shows that his counsel actively represented

competing interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Sullivan, supra,* 100 S.Ct. at 1719. Justice Marshall contends that, under this language, perhaps the seven Justices in the majority meant that adverse effect *necessarily* follows from a finding of actual conflict. *Sullivan, supra,* 100 S.Ct. at 1723 (Marshall, J., dissenting). This Court does not agree with Justice Marshall's conjecture as to what the majority of the Supreme Court possibly meant. In other words, it seems apparent from the majority opinion that the Supreme Court wanted to require a specific finding of some degree of adverse effect resulting from defense counsel's conflict of interest.

██ The Court has already explained that Parker and Pierce were situated differently enough that, in light of their jointly asserted defense, Public Defender Campbell represented them with a conflict of interest. Based on an evaluation of the state court record, a reasonable inference can be made that Pierce, but not Parker, was adversely affected by the conflict of interest. It will be recalled that Parker gave testimony at the trial that at one time he thought the prosecutrix wanted to have sex only with Pierce. It will also be recalled that defense counsel should have been aware of the contents of certain police reports which indicated that the prosecutrix

inflicted scratch wounds on Parker, but not on Pierce. These differentiations point to one inescapable conclusion—Pierce had a more credible claim to the defense of consent. And, this Court opines that it is reasonable to infer that Pierce's more credible defense could not have been advocated by defense counsel at trial without the risk of impairing the consent defense of co-defendant Parker. Therefore, since Pierce satisfies the two-part test elucidated in *Sullivan,* he is entitled to the habeas corpus relief he seeks. Even though Parker was also exposed to defense counsel's conflict of interest, the record provides no reasonable basis to infer that he was adversely affected. Just because Pierce is entitled to relief does not necessarily mean that Parker should obtain similar relief. *See Baty v. Balkcom, supra,* 494 F.Supp. at 967. The impact of the public defender's representation of conflicting interests was, as to Parker, *de minimus,* and therefore does not provide a basis for relief. *Pisa v. Streeter,* 491 F.Supp. 530, 534 (D.Mass.1980).

An Order shall be issued contemporaneously with this Memorandum.